

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00199-CV

_____

IN THE INTEREST OF J.K., J.K., AND J.K., CHILDREN

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-679087-20

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

Mother challenges the legal and factual sufficiency of the evidence to support the termination of her parental rights. We hold that Mother's criminal conduct, incarceration, drug use, mental health issues, and abuse and neglect of the children justify a finding that Mother endangered the children's well-being and a finding that termination was in the children's best interest. We therefore affirm as to Mother.

Father contends that the trial court abused its discretion by denying him permanent managing conservatorship of his daughter. We hold that there was no evidence to support the trial court's finding that appointing Father as managing conservator would significantly impair his daughter's physical health and emotional development. We therefore reverse as to Father.

## I.    BACKGROUND

Mother had three children, whom we refer to as Ashley, Brent, and Cindy.[1] Father met Mother in a rehab facility, where they conceived the eldest child, Ashley. The fathers of Brent and Cindy were not located.

In June 2019, the Texas Department of Family and Protective Services removed the children from Mother's custody and petitioned to terminate the parental rights of Mother, Father, and the biological fathers of Mother's other children. The case went

---

[1]To protect the minors' identity, we refer to the family members using pseudonyms. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2); *In re J.P.*, 598 S.W.3d 789, 791 n.1 (Tex. App.—Fort Worth 2020, pets. denied).

to trial in May 2021.[2] After hearing the evidence, the trial court terminated the parental rights of Mother and the biological fathers of Brent and Cindy. As to Mother, the trial court found that there were grounds for termination under Texas Family Code Section 161.001(b)(1)(D) and (E) and that termination was in the children's best interest. The trial court found that appointment of Father as the children's permanent managing conservator was not in their best interest because the appointment would significantly impair their physical health or emotional development. The trial court awarded permanent managing conservatorship of all three children to the Department, though it granted Father possessory conservatorship of Ashley. Mother and Father appealed separately.

## II. MOTHER'S APPEAL

In her first and second issues on appeal, Mother contests the legal and factual sufficiency of the evidence to support the trial court's two grounds for termination: that she knowingly placed or allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being, pursuant to Section 161.001(b)(1)(D); and that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical

---

[2]The trial court extended the deadline for dismissal of this case pursuant to the authority granted by Texas Family Code Section 263.401 and the Texas Supreme Court's emergency orders related to the COVID-19 pandemic. *See* Tex. Fam. Code Ann. § 263.401(b); Thirty-Third Emergency Order Regarding COVID-19 State of Disaster, No. 21-9004, 2021 WL 1031672, at *1 (Tex. Jan. 14, 2021); Twenty-Sixth Emergency Order Regarding COVID-19 State of Disaster, 609 S.W.3d 135 (Tex. 2020).

3

or emotional well-being, pursuant to Section 161.001(b)(1)(E). In her third issue, Mother levels a factual sufficiency challenge at the trial court's finding that termination served the children's best interest.

## A. Facts

Mother came to the Department's attention in April 2020 when the Department received a number of disturbing reports involving violence, malnutrition, and the children's poor living environment. In late May 2019, a Department investigator named Travis Hendry interviewed Mother and the children about these reports at the Salvation Army, where they were staying. Hendry found that Cindy, the toddler, was developmentally delayed; she was unable to stand, talk, or make any noises, and she was crawling in an abnormal manner. Hendry confirmed that Mother had not addressed Cindy's issues with a pediatrician or a specialist. Ashley had a soft cast on one hand because of a broken finger. As for Mother, Hendry was concerned for her mental health because Mother had been diagnosed with bipolar disorder, ADHD, and other mood disorders, but she had left her medications behind at a domestic-violence shelter where she had recently stayed.

On May 30, 2019, the Department received another referral concerning Mother indicating that Mother had whipped Brent with a phone charger. Department investigators came around midnight and saw that Brent indeed had red welts on his legs that were indicative of a whipping. The Department put a safety plan in place that barred Mother from physically disciplining the children, and Mother signed the plan.

4

Yet another referral came in on June 2, 2019. Hendry contacted Mother and learned that she had been kicked out of the Salvation Army because her children were not being properly supervised, so Mother and the children were staying at a Motel 6 in Fort Worth. When Hendry met her at the motel, Mother was erratic and hostile. Hendry confirmed that Mother still had not retrieved all her medications from the domestic-violence shelter. As Hendry described it, Mother decided to put Ashley and Brent in the corner for a time-out in the middle of the conversation, unprovoked and "out of nowhere." Mother resumed talking with Hendry, but when Ashley made a sound in the corner, Mother grabbed a bottle of deodorant spray, ran over to Ashley, and sprayed her in the face from six inches away. Mother kept threatening the children, declaring that when Hendry left, she was going to "whoop [their] butts. I don't care if I get another CPS case called in on me." Mother yelled at the children that their fathers did not want them, and she called Ashley "the devil child." Whenever Mother got near the children, they would run away and even jump over furniture to evade her; to Hendry, it seemed like the children were very afraid of Mother.

Hendry and his supervisor decided to initiate removal proceedings. While waiting for police to arrive, Mother let the children run around unsupervised, so Hendry had to corral the children back into the motel room. Hendry noticed that Ashley's soft cast was missing and that Mother had made no effort to put it back on. According to Hendry's testimony, Mother stated that whenever the children were returned, "she

5

would not be taking [Ashley]. She didn't want [Ashley], and she just would not be taking custody of [Ashley] when her children were returned to her."

In its post-removal interviews, the Department learned more about deficiencies in Mother's care. Mother had a pattern of "inappropriate discipline," a Department witness said; she would arbitrarily get upset and mete out stern punishments for seemingly minor infractions by the children. Whenever Ashley had issues, Mother would take her to a mental hospital, which the Department's witnesses viewed as inappropriate. The Department also learned that Ashley and Brent had not been in school the previous year.

The Department developed a service plan that required Mother to obtain stable housing, visit the children, undergo counseling, and complete other tasks in an effort to obtain the return of her children. But while Mother made some progress on the plan, she was unable to complete many of the tasks due in large part to her erratic behavior. For example, Mother was required to have her mental health medications monitored by MHMR, and she was referred to a program called True Mental Health to complete the monitoring. Mother was soon removed from the program because she was threatening and aggressive. True Mental Health took Mother back into the program a few months later, but she was soon discharged once more due to the same issues. This cycle of resuming the program, only to be removed yet again for hostile behavior, repeated itself once more before trial.

While the Department's case was pending, Mother had multiple criminal episodes. In one, Mother committed misdemeanor theft. Mother pleaded guilty to this offense and received one year of deferred adjudication. In another, Mother committed aggravated assault with a deadly weapon (a knife). Mother pleaded guilty to this offense as well and received three years of deferred adjudication. In yet another, Mother was charged with failure to identify. Mother remained in jail for that pending charge at the time of trial.

Mother maintained that she had previously been sober for ten years, but she admitted that she had relapsed and starting using drugs, and Mother repeatedly tested positive for controlled substances. In December 2019, Mother tested positive for barbiturates, codeine, and morphine. In January 2020, Mother tested positive for methamphetamine and cocaine. In March 2020, Mother again tested positive for methamphetamine. In January 2021, Mother tested positive for marijuana. To the Department's caseworker Michelle Barker, Mother sometimes seemed like "she was on something" during her visits with the children. As late as her March 17, 2021 visit with the children, Mother admitted that she was still using whatever she could get on the street, but she would not say what exactly she was using.

During that March 17 visit, Mother appeared at the appointed place in a condition that worried Barker. According to Barker, Mother had markings "all over her skin, her arms, her legs," and "she had written all over herself." Mother

> admitted to the children that she had taken a permanent marker and written on herself because she liked how it smelled . . . . Her hair was, uh, a mess. Her clothes were dirty. She smelled. She smelled really bad.
>
> Um, she had gone to the bathroom and washed—wiped some of the markings off her face before she had the visit with the children. She also had, like, a sleeping bag, and she had stuff in the bag, and . . . she appeared disheveled or, like, she was sleeping on the streets.

Mother missed many other visits altogether, even though Barker provided Mother with bus passes. Barker conceded that when Mother did attend visits, Mother would bring snacks and things for the kids. Still, ultimately, Barker believed that Mother had not "made any effort really to be safe and stable and provide the children with a safe home environment."

Barker further testified that the children's best interest would be served by the termination of Mother's parental rights. Barker explained that while the children had bounced between foster homes for a time, they were now in stable situations. Ashley in particular had bonded with her foster mother, who had a master's degree in counseling, and who had expressed interest in adopting Brent and Cindy and taking permanent managing conservatorship of Ashley.

Father also sought custody of the children. He testified at trial that he had invited Mother and the children to live with him sometime in 2018 or 2019, whereupon he put

8

the children in school and cared for them. However, Mother's aggressive and unpredictable behavior put an end to the situation; she had removed the children from school and left without explanation. Hendry said that this was consistent with Mother's modus operandi: Mother would show up at Father's residence, stay for a while, and then randomly leave without saying a word, and he would not hear from her for months at a time. Father testified that he was concerned for Mother's mental health, explaining that when she did not take her medication, as was usually the case, she would have violent episodes. However, Father testified that Mother never did drugs in his presence, and he was surprised to learn that she still did them.

For her part, Mother testified that she now took her medication regularly and that she was working with a Narcotics Anonymous sponsor to maintain her sobriety. Mother testified that she loved the children very much, that she had visited them as much as possible, and that she would do everything she could to live up to her responsibilities as a mother if she were allowed to keep the children.

## B.    Standard of Review

The United States Constitution and the Texas Constitution protect parents' rights to raise and nurture their children. *In re J.F.-G.*, 627 S.W.3d 304, 311 (Tex. 2021). "For the State to deny these rights to a parent, it must establish by clear and convincing evidence a legal ground to terminate the parent's right and that termination is in the child's best interest." *Id.* "This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal

9

proceedings." *In re M.N.G.*, 147 S.W.3d 521, 535 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g). "'Clear and convincing evidence' means a 'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (quoting Tex. Fam. Code Ann. § 101.007).

Consistent with this high evidentiary burden, appellate review in parental termination cases also warrants a heightened standard of review. *Id.*

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.
>
> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing.

10

*J.F.C.*, 96 S.W.3d at 266. Our inquiry must be whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## C.   Discussion

The trial court found a statutory ground for termination under subsection (E), which is satisfied where a parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "Endangering conduct under subsection (E) need not be directed at the child." *J.F.-G.*, 627 S.W.3d at 312 (cleaned up). "Nor must the child actually suffer injury." *Id.* (cleaned up). "Rather, 'endanger' means to expose to loss or injury; to jeopardize." *Id.* There must be "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *E.N.C.*, 384 S.W.3d at 803.

"Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act." *In re M.R.J.M.*, 280

11

S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). "Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *Id.* "The specific danger to the child's well-being may be inferred from parental misconduct standing alone." *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

The record reflects that while the case was pending, Mother committed multiple criminal offenses on separate occasions, and one offense was a felony. "A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *J.F.-G.*, 627 S.W.3d at 313. Mother remained incarcerated for the latest of these offenses at the time of trial, and imprisonment is also "certainly a factor the trial court may weigh when considering endangerment." *Id.* (cleaned up); *M.R.J.M.*, 280 S.W.3d at 503 ("[W]hen a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being.").

When Mother was not incarcerated during these proceedings, she consistently used hard drugs and even attended parental visitation seemingly under the influence. "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

The witnesses shared a consensus that Mother had serious mental health issues that went largely untreated, resulting in a volatile and violent mien. "A parent's mental health is frequently considered in reviewing the sufficiency of the evidence under endangerment grounds," especially when the issue is untreated. *In re J.P.-L.*, 592 S.W.3d 559, 583 n.26 (Tex. App.—Fort Worth 2019, pet. denied) (collecting cases).

That volatility left the children in fear, out of school, and shuffling from shelter to shelter as Mother's misbehavior or her failure to supervise the children resulted in their expulsion. "[A] parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013) (op. on reh'g en banc) (per curiam) (cleaned up), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

Mother also abused the children. As the Department confirmed, Mother lashed Brent, sprayed Ashley in the face with chemicals, and threatened to do more as soon as witnesses left. Mother verbally abused them as well, telling them that their fathers did not want them, calling Ashley the "devil child," and promising to disown her. As to what spurred the abuse, it seemed to have no correspondence with the legitimate ends of parental discipline and instead followed only Mother's unpredictable whims. A child can be endangered by violence directed toward children in the home. *See In re A.B.-G.*, No. 02-19-00066-CV, 2019 WL 3755770, at *8 (Tex. App.—Fort Worth Aug. 8, 2019, pet. denied) (mem. op.). And if the children suffered, Mother either did not care to fix it (Cindy's developmental delays went unattended to, and the cast on Ashley's broken

finger was not replaced) or drastically overcorrected for it (Ashley's emotional problems resulted in trips to a mental institution rather than parental counseling). "A child's . . . medical needs and lack of attention thereto, and his subjection to physically abusive parents are indicia which may prove endangerment." *In re T.S.*, No. 02-10-00089-CV, 2010 WL 4486332, at \*7 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.) (cleaned up).

In addition to violence towards the children, there was also violence around the children. Mother admitted that the children witnessed domestic violence between her and her partners. "[E]vidence of children's observations of domestic violence can be used to support a finding of endangerment." *A.B.*, 412 S.W.3d at 681.

We acknowledge Mother's testimony about her love for and devotion to the children, but those sentiments perhaps would have been better reflected in actions—a demonstrated commitment to changing her destructive behaviors and curbing their impact on the children—not in trial testimony. Even under our heightened standard of review, the evidence is both legally and factually sufficient to support the trial court's finding that Mother's conduct endangered the children's physical and emotional well-being.[3] *See J.F.C.*, 96 S.W.3d at 266. We overrule Mother's first and second issues.

---

[3]Because the evidence is sufficient to support the trial court's finding under subsection (E), we do not consider whether the evidence would also be sufficient under subsection (D). *See In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at \*15 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op).

The evidence outlined above also tends to establish the second termination prong—best interest—which "is child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A best-interest determination is guided by several nonexclusive factors: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent–child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013). A court need not have evidence on every factor to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re E.S.*, No. 02-20-00407-CV, 2021 WL 2149627, at *7 (Tex. App.—Fort Worth May 27, 2021, pet. denied) (mem. op.). "Proof of acts or omissions providing grounds for termination under section 161.001(b)(1) does not relieve the petitioner from proving the best-interest element, but the same evidence may be probative of both." *A.C.*, 560 S.W.3d at 631–32.

Viewed through the lens of this multifactor test, Mother's criminal conduct, incarceration, persistent drug use, poorly controlled mental health issues, physical and mental abuse, domestic violence, failure to attend to the children's medical needs, and

15

the uncertainty and instability she imposed in their lives weigh strongly in favor of the trial court's best-interest determination.

Beyond that evidence, there was also proof that pertained to certain of the factors discretely. As to the children's desires, there was evidence that Brent no longer wanted to have visits with Mother, much less to return to her care. As to programs available to Mother, there was evidence that she had exhausted multiple community resources through her aggression and hostility. As to plans for the children and the stability of the home, there was evidence that Ashley's current foster mother was uniquely capable of caring for the children and that she intended to adopt Brent and Cindy and take permanent managing conservatorship of Ashley. "Evidence about placement plans and adoption are, of course, relevant to best interest." *C.H.*, 89 S.W.3d at 28. By contrast, Mother had no plan for the children except for them to be placed with Father (whom a Mississippi placement agency had already determined was not allowed to take Brent and Cindy) or Father's sister (who had not obtained the certifications necessary to take custody of the children and had made little effort to do so).

We hold that the evidence is factually sufficient to support the best-interest prong of our termination inquiry. *See J.F.C.*, 96 S.W.3d at 266. "[C]ourts can never stand idly by while children are placed in situations that threaten their health and safety." *In re Lee*, 411 S.W.3d 445, 456 (Tex. 2013) (plurality op.) (orig. proceeding). The trial court did not err by terminating Mother's parental rights. We overrule Mother's third issue.

### III. FATHER'S APPEAL

In his sole issue, Father asserts that the trial court abused its discretion by finding that his appointment as Ashley's sole managing conservator would significantly impair her physical health or emotional development. Father asserts that there is no evidence that he engaged in conduct indicating his conservatorship would put Ashley in harm's way, and thus that there is no evidence to demonstrate significant impairment.

### A. Facts

At trial, Father sought to be named permanent managing conservator of all three children or, in the alternative, of at least his daughter Ashley. Father intended to move the children into his apartment in Mississippi.

The Department argued that the children's current foster placements were preferable. It elicited evidence that Ashley's current foster mother had a master's degree in counseling and was adoption motivated.[4] Barker testified that Ashley had opened up to her foster mother, which was unusual for Ashley. By Barker's account, Ashley did not have enough of a relationship with Father, and sending her to live with him could be like moving her in with "a stranger." Barker was also concerned that placing Ashley alone with Father would mean separating her from her siblings, which it was undisputed that Ashley did not want.

---

[4]We note that Ashley's foster mother did not testify at trial, and Mother's counsel suggested that, shortly before trial, the Department invented the idea that she was adoption motived in order to make the Department's proposed plan seem more appealing.

17

However, Barker agreed that all three of Ashley's foster families had essentially been strangers when Ashley moved in, and she admitted that the children had previously lived with Father for several months. He had invited Mother and the children to live with him approximately three years earlier, whereupon he had moved out of his one-bedroom apartment into a three-bedroom apartment that was better suited for a family. Department witnesses agreed that he had cared for the children until Mother took them and left. Barker also agreed that the children had a close bond with Father and talked with him regularly on the phone. Mother testified similarly, explaining that the children had a strong bond with Father and that Brent and Cindy knew him as their dad.

There was also evidence to suggest that the children's foster situation was hardly a model of stability. Brent and Cindy were in their second foster home, and Ashley was in her third, having been removed from the first two homes due to her emotional "meltdowns." In their then-current situation, the children were limited to seeing each other only once a week. And as to the security and stability of the potential arrangements, it was conceded that Ashley's current foster mother had the right to send Ashley away at any time upon thirty days' notice—just as her two prior foster families had done—whereas Father would have no such right if he were granted managing conservatorship.

Separately, the Department argued that placement with Father would be improper because he and Mother had a history of domestic violence. Mother defended

18

Father's character on this account, saying that the violence between her and Father had never posed a direct threat to the children's physical welfare and that, despite their history, she wanted the children to be placed with Father:

> Regardless of the issues that me and [Father] have and the domestic violence history that we have had, I have never known him to be physically or emotionally or verbally abusive in any way toward the children. He's always been a good father, I feel like. He's a good person.
>
> He's a Christian man, and if I'm not able to have our children with us, I would prefer that they be with either him or their [a]unt . . . .

The Department also maintained that Father was unfit to care for the children due to his age, health issues, and low income. Father was in his mid-60s at the time of trial, and he suffered from diabetes, high blood pressure, gout, and general aches and pains. A bout of flu left Father hospitalized and on oxygen in early 2020, though he had since recovered. It was further established that Father had been on disability since 2000 due to blood clots in his legs, leaving him with only $860 per month in income.

However, Father maintained that he had no major health issues and that the health issues he did have were well managed with regular medication. A letter was offered into evidence in which Father's doctor averred that Father was fit and capable of taking care of his daughter. It was established that the Department routinely placed children with parents who have health issues that are under control and that there was no policy against doing so. As to finances, Father paid only $250 in rent for his three-bedroom apartment because he received government assistance with his housing, leaving more income to devote to Ashley than might otherwise be the case.

19

Another theme of the Department's arguments and evidence at trial was that Father was too irresponsible to be a suitable conservator. The Department offered evidence that a child placement office in Mississippi had rejected Father as a candidate for the placement of Brent and Cindy for unspecified reasons. Witnesses at trial believed that the rejection may have been connected to Father's past criminal history, which included the suspension of his license for driving while intoxicated, an arrest for driving while his license was suspended, and a public intoxication charge from 2001. Lastly, the Department faulted Father for allowing the children to remain with Mother; Hendry testified that he was "not aware of any efforts made by [Father] to get custody of the children."

Conversely, there was also evidence that Father was a responsible caregiver. He had successfully raised his five other children, all of whom were grown and married, and he had never come under the scrutiny of child protective services. When, in this case, child placement officials came to his apartment for a home study and told him he needed a fire extinguisher, he obtained one the next day. Father had recently obtained auto insurance and a lawyer in pursuit of his driver's license in order to provide transportation for Ashley, and he attested that he had previously tried to obtain custody of the children but that legal obstacles prevented it.

Furthermore, the evidence suggested that Father had corrected his alcohol problem. It was undisputed that Father regularly tested negative for all drugs throughout the case, and when he was asked about his stint in rehab with Mother,

Father testified that he had gone to rehab solely for alcohol issues and that he had long since been sober.

Father testified that he had a family support system nearby, including his siblings, nieces, and nephews to help with the children. He promised that if he were granted permanent managing conservatorship, he would keep the apartment fit for the children, would be very protective of them, and would seek assistance from legal aid in the event of future legal troubles. He closed his testimony by explaining the joy he took in the children and discussing his best memory of them:

> A. Being with them and seeing how happy and how joyful they was with all of us together, you know, just bonding with them, staying with them, talking to them, playing games. I miss that so much.
>
> Q. And you love them, right?
>
> A. Yes.

## B.      Standard of Review

Conservatorship determinations made after a bench trial are governed by a preponderance of the evidence standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). The appointment of a conservator is subject to review for abuse of discretion and may be reversed only where the decision is arbitrary and unreasonable. *Id.* Under the abuse of discretion standard, legal and factual insufficiency are not independent grounds for asserting error; they are merely relevant factors in assessing whether a trial court abused its discretion. *In re S.T.*, 508 S.W.3d 482, 489 (Tex. App.—Fort Worth 2015, no pet.). An abuse of discretion does not occur for want of evidence when the trial court bases

its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Id.* at 490.

## C. Discussion

The children's best interest is the primary consideration in determining conservatorship issues. Tex. Fam. Code Ann. § 153.002; *Danet v. Bhan*, 436 S.W.3d 793, 796 (Tex. 2014). The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by American law. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000); *Lee*, 411 S.W.3d at 454. There is thus a presumption "deeply embedded in Texas law" that appointment of a parent as managing conservator is in the child's best interest. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *see* Tex. Fam. Code Ann. § 153.131(a). This presumption rests on the natural affection that parents and their children usually share.[5] *V.L.K.*, 24 S.W.3d at 341.

A nonparent can rebut the presumption by showing that appointment of the parent would significantly impair the child's physical health or emotional development or by showing that there is a history of family violence[6] involving the parents. Tex.

---

[5]Although Father sought managing conservatorship of all three children, the parental presumption applies only with regard to his biological child Ashley.

[6]Family violence is defined as an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself. *C.C. v. L.C.*, No 02-18-

Fam. Code Ann. § 153.131; *J.A.J.*, 243 S.W.3d at 614. Impairment must be proved by an evidentiary preponderance indicating that some specific, identifiable parental behavior or conduct, shown by specific acts or omissions, will probably cause that harm. *Critz v. Critz*, 297 S.W.3d 464, 474 (Tex. App.—Fort Worth 2009, no pet.). "This is a heavy burden that is not satisfied by merely showing that the non-parent would be a better custodian of the child." *Id.* at 474–75. "'Close calls' should be decided in favor of the parent." *Id.* at 475.

Evidence of significant impairment includes physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent. *S.T.*, 508 S.W.3d at 492. Other considerations include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and a chaotic lifestyle that has put and will continue to put the child at risk. *Id.* "The material time to consider is the present, and evidence of past conduct may not, by itself, be sufficient to show present unfitness." *Id.* "The link between the parent's conduct and harm to the child may not be based on evidence that merely raises a surmise or speculation of possible harm." *Id.* at 492–93.

Under this rubric, the Texas Supreme Court in *Lewelling v. Lewelling* reversed a trial court's decision to appoint nonparents as managing conservators on facts comparable to those here. 796 S.W.2d 164, 168 (Tex. 1990). The court held that there

00425-CV, 2019 WL 2865294, at *7 (Tex. App.—Fort Worth July 3, 2019, no pet.) (mem. op.) (citing Tex. Fam. Code Ann. §§ 71.004(1), 153.004(g)(2)).

23

was no evidence that the mother had committed the sort of specific acts or omissions that would significantly impair the child's health or development despite the evidence that (1) the mother continued to see her abusive spouse, (2) she was unemployed, (3) she had little money, (4) she lived in a small house with her mother and other family members, (5) she had twice been a patient at a mental hospital, and (6) the child had lived most of his life with his grandparents. *Id.* at 165–66. Likewise, in *In re S.W.H.*, this court reversed a judgment appointing nonparents as sole managing conservators, concluding that the following was no evidence of impairment: (1) the mother was a recovering alcoholic and drug addict who was four years sober, (2) she had previously used "illicit substances" during pregnancy, (3) she was incarcerated after twice testing positive for controlled substances in violation of her probation, and (4) she lived with a boyfriend who continued to drink outside the home. *See* 72 S.W.3d 772, 775, 777–79 (Tex. App.—Fort Worth 2002, no pet.).

Here, the Department's appellate case for significant impairment focuses almost entirely on Father's generalized negative attributes—his health, his income, his alleged irresponsibility, etc.—and the favorable attributes of Ashley's current foster mother. But in light of the parental presumption, this sort of approach cannot succeed. We do not simply convey children from lower quality parents to better nonparents. *Critz*, 297 S.W.3d at 474–75. Rather, under the impairment test, the state's considerable power to intrude in family affairs may be used only to avoid custody situations that would harm

24

the child. The potential for harm must be demonstrated through the parents' specific acts or omissions. *Id.* at 474.

The Department's brief discusses no such acts or omissions, and the record reflects only two sets of acts that might qualify. First, there were Father's criminal offenses in connection with his alcohol abuse. Father committed a series of alcohol-related offenses that resulted in the suspension of his driver's license and, subsequently, an offense for driving while his license was suspended. We have identified "drug or alcohol abuse" as conduct that might justify a finding of significant impairment, and the case for impairment is only heightened by the criminal dimension of Father's actions. *See S.T.*, 508 S.W.3d at 492.

However, again, the relevant time is the present. *Id.* "If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling." *Critz*, 297 S.W.3d at 475. Father consistently tested negative for controlled substances throughout this case, and he testified that he had long since overcome his issues with alcohol:

> A. I was gonna say it's been years, years since I've drunk alcohol. I haven't been drinking. I don't drink no more. I don't smoke cigarettes. I don't do anything. Alcohol was my choice of drug.

> Q. . . . Okay. . . . [Mother] had said y'all had been in drug rehab back in 2008.

25

A. Yes, ma'am. I went to, uh—it was a do-or-die program. When I went to Baton Rouge, I went to a public alcohol program, and I also had—I got in AA, NA, stuff like that, and got a sponsor, yes, ma'am.

The Department offered no evidence to controvert this testimony. Father's past insobriety is not the sort of conduct that indicates a present risk of impairment to Ashley's health and development. *See S.W.H.*, 72 S.W.3d at 778–79 (reasoning that in light of the "uncontroverted evidence" that the mother had been sober for years, "none of this evidence regarding Appellant's actions more than four years ago demonstrates that appointing Appellant managing conservator today would significantly impair [the child's] physical health or emotional development"); *see also In re D.R.T.*, No. 11-12-00059-CV, 2014 WL 887342, at *4 (Tex. App.—Eastland Feb. 28, 2014, no pet.) (mem. op.) (determining that past substance abuse was "not necessarily indicative of . . . present fitness as a parent").

Second, there was testimony concerning domestic violence. However, in its findings of fact, the trial court found that significant impairment alone rebutted the parental presumption; it did not make a finding of family violence, such as would have independently negated the parental presumption. *See* Tex. Fam. Code Ann. § 153.131; *J.A.J.*, 243 S.W.3d at 614. Under these circumstances, the trial court's findings may not be extended by implication to include an affirmative finding on the independent ground of family violence: "an express finding of fact cannot extend by implication to cover independent grounds of defense" and "cannot extend to cover further independent issuable facts." *F. R. Hernandez Constr. & Supply Co. v. Nat'l Bank of Com. of Brownsville*,

26

578 S.W.2d 675, 679 & n.4 (Tex. 1979); *Nguyen v. Nguyen*, 355 S.W.3d 82, 92–93 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *Intec Sys., Inc. v. Lowrey*, 230 S.W.3d 913, 919 (Tex. App.—Dallas 2007, no pet.).  Because the trial court expressly found only significant impairment—and not the independent ground of family violence—we will not imply a finding of family violence.  *See, e.g.*, *Fountain v. Ferguson*, 441 S.W.2d 506, 507 (Tex. 1969).  We thus limit our focus to the question of whether the evidence of domestic violence supports the trial court's finding of significant impairment.

We do not discount the severity of domestic violence, but two considerations weigh against judging it to be evidence of impairment in this case.  First, the parties' circumstances limited the potential for future domestic violence.  Mother's parental rights were terminated, and we have overruled Mother's appeal of that ruling.  At the time of trial, Mother and Father had not seen one another in two years, and there was no evidence that Mother had any ties to Father aside from her now-terminated parental rights to their child.  The fact that Mother would have no apparent role or presence in Father's household mitigates the threat that Ashley would be exposed to further violence between Father and Mother.  Moreover, there was no evidence that Father had engaged in domestic violence with anyone besides Mother, and thus no indication that placing Ashley with Father could have otherwise exposed her to domestic violence.

Second, Mother and Father had known one another for twelve years, but there was no evidence as to when the abuse occurred in that span, and because they had not seen one another in over two years at the time of trial, the abuse could not have

27

happened recently. With no evidence to show that the abuse was recent, and with some evidence to show that it was not, the abuse can fairly be viewed as the sort of past conduct that is not controlling of present impairment. *See S.T.*, 508 S.W.3d at 492; *In re K.R.B.*, No. 02-10-00021-CV, 2010 WL 3928727, at \*11 (Tex. App.—Fort Worth Oct. 7, 2010, no pet.) (mem. op.) (deeming criminal conduct that occurred two years prior to trial to be "past criminal conduct" that would not necessarily sustain a significant impairment finding). In short, there was no evidence beyond speculation or surmise to establish the requisite link between Father's conduct and a present risk of harm to Ashley.[7] *S.T.*, 508 S.W.3d at 492–93.

In the absence of any evidence of the sort of specific, identifiable parental behavior that would probably cause harm to Ashley, we hold that the trial court abused its discretion by finding that appointment of Father as Ashley's sole managing conservator would significantly impair her physical health or emotional development. *See Critz*, 297 S.W.3d at 474. We therefore presume that appointing Father as Ashley's permanent managing conservator was in her best interest. *See* Tex. Fam. Code Ann. § 153.131(a); *V.L.K.*, 24 S.W.3d at 341. Because the child's best interest is the primary consideration in determining conservatorship issues, the trial court erred in denying

---

[7]The trial court also likely considered the negative impact of separating the siblings. But the Department's proposed plan would lead to the equally unpalatable result of separating a child from her rightful parent. With the parental presumption intact, such a result is untenable.

Father permanent managing conservatorship.  *See* Tex. Fam. Code Ann. § 153.002; *Danet*, 436 S.W.3d at 796.  We sustain Father's sole issue.

## IV.  CONCLUSION

We affirm the trial court's judgment with respect to Mother.  We reverse the trial court's judgment with respect to Father and remand for the entry of a judgment that names Father as Ashley's permanent managing conservator.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered:  November 4, 2021